E-FILED
Wednesday, 16 January, 2008  03:18:47 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| STEPHEN A. CONOVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  07-3081 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court for judicial review of Defendant Commissioner of Social Security's denial of Plaintiff Stephen A. Conover's application for Disability Insurance Benefits and Supplemental Security Income (collectively disability benefits) under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416, 423, 1381a, and 1382c.  For the reasons set forth below, the Decision of the Commissioner is reversed and remanded for further proceedings.

## STATEMENT OF FACTS

Plaintiff Conover was born on May 18, 1967.  He graduated from

high school and completed one semester of college. He has been diagnosed with spasmodic torticollis, which produces spasms on the right side of his neck. The spasms cause Conover's head to pull to one side. He also has tremors of the neck, head, arms, hands, legs, and tongue. Conover has been treated for this condition since 1991 by Alfred Harney, M.D. In May 1992, Dr. Harney ordered a CT scan that showed a normal brain and neck. Certified Record of Proceedings (d/e 7)(hereinafter R.), at 191. In November 1998, Conover complained of loss of vision and tingling. Dr. Harney ordered an MRI and EEG. The MRI showed a retention cyst and sinusitis, and the EEG was normal. R. 177-79.

Conover also developed depression. From May 9, 2001, to November 30, 2001, Conover saw Richard E. Dimond, Ph.D, a psychologist, for marriage therapy and individual therapy. Dr. Dimond provided a narrative report regarding his treatment of Conover dated June 23, 2003. R. 142. Dr. Dimond stated Conover had some obsessive-compulsive symptoms and depression. Dr. Dimond stated that the situation was complicated by Conover's episodic alcohol abuse. Dr. Dimond recommended medicine for his depression. Dr. Harney prescribed Prozac initially. According to Dr. Dimond, the medicine was then changed to Paxil and then Valium. Dr.

2

Dimond stated that Conover had a pattern of returning home from work and falling asleep on the couch, and then being disoriented when he awoke. Conover also had trouble sleeping at night. The medication seemed to correct some of the sleeping problems, according to Dr. Dimond. Id.

Dr. Dimond stated that the therapy did not go well. Conover continued to display all of his problems, notably problems with anger. Dr. Dimond stated that Conover had a personality disorder that included passive-aggressive behavior, dependency and poor impulse control. Dr. Dimond stated that Conover worked regularly during therapy and he noted no symptoms that would lead him to encourage Conover to apply for disability. Id.

Conover stopped working on January 30, 2002. Prior to that date, he worked for thirteen years as an in-shop service technician for Sears, repairing small appliances. Conover stated that his job required frequently lifting 100 pounds and that the heaviest weight he lifted was 150 pounds. R. 86. In written submissions, Conover stated that his condition did not cause him to reduce the number of hours worked and did not affect his attendance at work. R. 85. At the initial hearing, however, he testified that he missed work one to two days a week because of his condition. R. 354.

The records from Sears showed that in the calendar year 2001, he worked an average of about 55 hours in an 80 hour pay period.  R. 82-83.

Conover was laid off on January 30, 2002, because Sears closed the shop on that date.  Sears offered Conover a job servicing appliances in customers' homes, but Conover testified that he could not take the job because he would have been required to drive all day traveling from house to house.  Conover testified that his neck spasms, and the resulting uncontrolled turning of his head to one side, caused a reduction in vision that prevented him from driving all day.  R. 340.  Conover has not worked since.  He received unemployment benefits for about one year.  R. 341.  He filed for disability benefits in April 2003.

On June 2, 2003, psychologist Stephen G. Vincent, Ph.D., performed a consultative examination of Conover.  At that time, Conover was taking Temazepam for sleep and Effexor for depression.  Conover reported trying various antidepressant drugs without much effect.  Conover reported smoking a pack of cigarettes a day.  He denied any alcohol or drug abuse. R. 134-35.

Dr. Vincent concluded that Conover's physical problems caused his depression.  Dr. Vincent concluded that the depression included:

> [D]ifficulties with, at times, motivating himself to the point where he feels somewhat sluggish and cannot get going, hence he experiences fatigue.  He reports difficulties with irritability, restlessness, lack of interest in previously enjoyable activities, fluctuations in sleep pattern to the point where at times he is easily fatigued.  He reports lack of energy, troubles in regards to concentrating, with associated difficulties with being rather withdrawn and isolated due to preoccupation in regards to the manner in which his physical problems do affect his physical appearance.  He is not psychotic, nor is he suicidal.  Premorbidly he has no history of psychological or psychiatric treatment. Cognitively he is intact.

R. 136.  Dr. Vincent's diagnosis was major depression, secondary to general medical condition.  Id.

On June 18, 2003, Vittal V. Chapa, M.D., performed a consultative examination.  Dr. Chapa observed muscle spasms in Conover's neck from the torticollis.  Dr. Chapa stated that Conover did not have full range of motion of the cervical spine.  When Conover rotated his head, the muscle spasms in the neck caused his head to move involuntarily.  Dr. Chapa observed evidence of muscle spasms in the cervical area.  The examination of Conover was otherwise normal.  Dr. Chapa found that Conover had good hand grip bilaterally and could perform both fine and gross manipulations with his hands.  R. 137-40.

On June 23, 2003, a Mental Residual Functional Capacity Assessment

was conducted (Mental RFC Assessment).  The reviewing physician marked the boxes on the assessment form to indicate that Conover was moderately limited in his ability: (1) to understand and remember detailed instructions; (2) to carry out detailed instructions; (3) to maintain concentration for extended periods; (4) to interact appropriately with the general public; and (5) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  R. 194-95.[1]

At the end of the form, the reviewing physician wrote a handwritten note, as follows:

> This claimant has mild to moderate depressive symptoms associated with his torticollis.  He had some therapy in 01, and has been on antidepressants off and on from his [primary] care MD.  His muscle spasms diminish his concentration and make him feel self conscious.  On exam he's coherent, relates and responds appropriately.  Cognitive skills are fair to good.  He does some chores, [undecipherable handwritten word], and can go out alone.
>
> Within the parameters of his physical RFC, he could perform simple tasks adequately.  He shouldn't have to deal [with] the public.

R. 196.

---

[1]The reviewing physician's signature is undecipherable, and his name is not otherwise given in the record.

On July 11, 2003, a Physical Residual Functional Capacity Assessment (Physical RFC Assessment) was performed by T. Arjmand, M.D.   Dr. Arjmand opined that Conover could: (1) lift 20 pounds occasionally and 10 pounds frequently; (2) stand and/or sit for about six hours in an eight-hour day; (3) sit less than six hours in an eight-hour day; (4) occasionally climb ramps and stairs; (5) never climb ladders, ropes, and scaffolds; (6) occasionally engage in balancing, stooping, kneeling crouching, and crawling; and (7) avoid hazards such as machinery or heights.  Dr. Arjmand otherwise found no limitations.  Dr. Arjmand opined that Conover could perform light work and should avoid working around machinery or at heights due to his history of headaches and involuntary head movements. R. 219.

On August 29, 2003, Conover was seen by a neurologist, M. L. Mehra, M.D.  Dr. Harney referred Conover to Dr. Mehra.  Dr. Mehra found that Conover suffered from torticollis and essential tremors.  The torticollis did not respond to Botox injections, and the tremors were made worse by medication.  Dr. Mehra also ordered an MRI of the head and neck.  The results were normal.  Dr. Mehra recommended Inderal LA and a glass of wine in the evening to control the tremors.  Dr. Mehra saw Conover a week

later on September 5, 2003.  Dr. Mehra reported that the tremors were 60-70% suppressed.  Dr. Mehra said in his notes that he would follow Conover closely, but did not see him again.  R. 143-45.

In August and September 2003, Conover was seen by an otolaryngologist, Richard M. Bass, M.D., for recurring ear problems.  Dr. Bass diagnosed a chronic dermatitis on the exterior of the ear.  Dr. Bass' notes indicate that Conover reported smoking a pack of cigarettes a day and drinking six drinks a day.  Dr. Bass prescribed a lotion for the dermatitis. R. 220-23.

On November 10, 2003, Dr. Harney filled out a form entitled Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment.  R. 224-30.  Dr. Harney opined that Conover had not been able to perform light or sedentary work on a regular and continuing basis.  On November 15, 2003, Dr. Harney completed a form entitled Interrogatories to Treating Physician.  Dr. Harney stated on that form that Conover's torticollis caused uncontrolled turning of his head and tremors in both hands.  R. 231.

In September 2004, Dr. Harney referred Conover to a psychologist, R. Leon Jackson, Ph.D., for testing and evaluation.  Dr. Jackson conducted

8

a large number of tests in late September and early October 2004. The testing took a total of eight hours. Dr. Jackson issued a report dated October 16, 2004. R. 232. His possible diagnostic impressions of Conover included: (1) generalized anxiety disorder with dysmophobic reactions to medical symptoms; (2) major depressive disorder; (3) alcohol abuse; and (4) sedative, hypnotic, or anxiolytic abuse. R. 237. Dr. Jackson opined that Conover's, "Level of disability appears to be at the severe level with guarded prognosis." Id. Dr. Jackson recommended treatment, but there is no evidence that his suggestions were followed.

On August 2, 2005, the ALJ held an evidentiary hearing. Conover and his counsel were present. Conover and vocational expert Bonnie Gladden testified. Conover testified first. Conover testified that he lived at home with his wife and two teenaged children. His wife ran a cleaning business. Conover testified that he had no medical insurance, medical card, or other means to assist in paying his medical bills. R. 339. He testified that he graduated from high school and went to college for one semester. R. 339. Conover stated that he worked at Sears in its repair shop until January 30, 2002. He repaired small appliances such as vacuum cleaners, lawn mowers, and microwave ovens. He worked there for 13 years. He testified that he

had been having attendance and concentration problems before the shop

closed:

> I had been having problems with attendance and the ability to concentrate and focus on what I was working on and it was affecting my attendance like I said. And then they eliminated the shop--repair center and it went to where you had to be an on the road technician is what they called them. Which meant I-- they would have had to--would had a van and drive from house to house to repair appliances in the homes and that would have been eight to 10 houses per day. And it was all driving, so I was unable to do any of the driving.

R. 340. Conover testified that he was laid off and received unemployment

benefits for about a year. R. 341.

The ALJ asked Conover to describe the problems that would keep him

from working. Conover said:

> Well, with my head turning and I got a lot of pain. It causes--it's kind of like when you get up in the morning and have a kink in your neck but this lasts me all day. And then my head--the [INAUDIBLE] causes my head to want to twist, which I have to--which I correct and resist. It causes a lot of fatigue and pain and then my vision gets distorted. I also have [INAUDIBLE] tremors and degenerative disk disease . . . .

R. 343-44. The ALJ asked about the vision problem. Conover explained:

> I'm unable to look at something for any extended period of time and stay focused on it and my hands shake. I'm unable to for instance turn screws or do anything efficiently to--that would be productive at all.

R. 344.

The ALJ asked if there were any other problems.  Conover responded: "Well, the--with my head being to one side and I have to look straight ahead.  I have focus problems and my vision gets distorted.  Also my hands shake pretty bad."  Id.  Conover said that the medications helped slightly.

The ALJ asked Conover about his drinking.  Conover said that he drank occasionally during the week and on weekends.  He said that he drank beer in the evenings maybe two to three times a week.  He said that he drank two to three beers at such times.  He said that he had never been treated for alcohol abuse.  Conover also said that he drank red wine on occasion because Dr. Mehra suggested it to help the tremors.  Conover did not notice any effect on the tremors from the wine.  The ALJ asked if Conover ever drank more than three beers at a time.  Conover said that he occasionally drank more than that amount on the weekends.  He said he could not drink more than six beers at a time.  He said that the last time he drank six beers was three weeks to one month before the hearing.  R. 346-47.

Conover described his daily activities.  He took care of his personal hygiene, although brushing his teeth and shaving were difficult because of

the neck spasms.  He tended to gag when brushing his teeth.  He dressed himself.  He spent most of the day sitting in a recliner with his head supported.  He generally watched television while in the recliner.  Conover testified that he did not do any housework or yard work.  He heated leftovers in the microwave, but did not otherwise cook.  He did not go shopping because the spasms and uncontrolled turning of his head caused fatigue and pain.  He did not read or use the computer.  R. 349-50.  He said that he tried getting on the Internet, but could not get the hang of it.  He said that he could not sit and look at the screen and type.  It was too difficult for him.

Conover testified that he had a driver's license, but rarely drove.  The last time he drove was three months earlier; he went to the gas station a few blocks from his home to buy some cigarettes.  R. 352.

Conover's counsel then questioned him.  Conover testified that he missed at least one to two days per week of work before he was laid off.  R. 354.  The pain also interfered with his ability to perform his job.  He would not be able to repair an appliance completely.  One of the other workers would have to complete the job.  He had trouble with vision and hand-eye coordination to perform detailed repairs of small pieces of equipment.

Conover also testified that sitting was difficult.  R. 355-56.

Conover also testified that he had problems with severe headaches three to four times a week.  He also said that he had tremors in his hands. The condition also caused him to slur his speech sometimes.  Conover also did not like going out in public because of the tremors and involuntary head turning.  R. 356-60.

Vocational expert Bonnie Gladden then testified.  The ALJ asked Gladden the following hypothetical question:

> Ms. Gladden, I would like you to assume an individual who is 38 years old with a high school education, past relevant work as described.  An individual who would be limited to light and sedentary work with the following exceptions.  No jobs, which would require climbing or working at unprotected heights.  No jobs, which would require over shoulder work.  And no jobs, which would require more than occasional neck turning.  How would these restrictions affect the performance of the past relevant work?

R. 362.  Gladden stated that such a person could not perform Conover's past relevant work.

The ALJ then asked about whether such a person could perform unskilled, entry-level work, assuming no transferable skills.  Gladden stated that a person described in the hypothetical question would not have transferrable skills.  Gladden then opined that such a person could perform

13

jobs such as general cleaning, cashier, bookkeeping clerk, receptionist, information clerk, office clerks, and hand packager.  R. 362-63.

On examination by Conover's attorney, Gladden stated that none of the jobs listed would allow only occasional grasping, fingering and manipulation, except maybe general cleaning.  Gladden further testified that none of the jobs could be performed if the person had difficulty with near vision.  Gladden was also asked whether any of the jobs would allow a person to miss more than two days a month.  Gladden said that the Department of Labor cites such absenteeism as a reason for loss of employment.  R. 365-66.

At the end of the hearing, Conover's counsel asked for permission to submit Conover's attendance records from his last job.  The ALJ allowed the request.  Conover's counsel then submitted records of the hours worked for each two-week pay period in 2001 and January 2002.  R. 82-83.

Dr. Harney submitted a letter dated October 21, 2005.  R. 316-17. He stated that Conover's problems began in 1992.  He stated that the torticollis worsened over time, and Conover developed depression.  He stated that he was not surprised by Dr. Jackson's opinion that Conover was disabled.  Dr. Harney concluded:

> For a number of reasons I think that Steve is not employable at this time and is disabled.  I think his disabilities are multifactorial and include some medical components which involve the torticollis which he has continued to experience. Probably one of the major components and probably the most difficult to treat component to his un-employability is his neuropsychological disability which includes anxiety, depression, agitation and as it relates to his feelings about how he feels his dysmorphic symptoms.

R. 317.

The ALJ issued her Decision on November 15, 2005.  The ALJ followed the five-step analysis set forth in the Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.   20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d). Such severe impairments are set forth in the Listings.  20 C.F.R. Part 404 Subpart P, Appendix 1.  The claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the ALJ to determine whether the claimant is able to return to his prior work considering his RFC. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ determined that Conover met his burden at Steps 1 and 2 of the Analysis. Conover had not worked since January 30, 2002, and he had severe impairments due to his physical and mental conditions. She did not identify the specific impairments that were severe. At Step 3, the ALJ determined that Conover's condition did not meet any Listing. R. 254-55.

The ALJ then moved to Step 4. The ALJ concluded that Conover had the RFC to perform unskilled light and sedentary work, with no climbing or work at unprotected heights, no over shoulder work and no work requiring

more than occasional neck turning.  The ALJ found Conover's testimony not to be credible.   She also rejected the opinions of Dr. Harney and Dr. Jackson.  She relied on evidence from Dr. Dimond, Dr. Chapa, Dr. Mehra, and Dr. Arjmand to support her conclusions regarding his RFC.  She also relied on Conover's written submissions in which he stated that he did some house work and yard work.  She also stated that he drove and used the Internet.  Given this RFC, she concluded that Conover could not perform his prior work at Step 4.  R. 256-58.

The ALJ then addressed whether the Commission met its burden at Step 5.  She concluded that Conover could perform a significant number of jobs in the national economy based primarily on Gladden's testimony.  The ALJ, thus, concluded that Conover was not disabled.  R. 259.

Conover appealed this Decision to the Appeals Council.  The Appeals Council reversed and remanded the Decision.  R. 277.  The Appeals Council reversed the Decision because the ALJ: (1) did not consider a supplemental report from Dr. Harney dated October 21, 2005; (2) did not specify at Step 2 the severe impairments that Conover suffered from; (3) did not address the Mental RFC Assessment; and (4) needed to more accurately evaluate Conover's mental limitations.  R. 277-78.

On remand, the ALJ held a second evidentiary hearing on May 17, 2006.  Conover and a vocational expert, identified as Bob Hammond, testified at this hearing.[2]  Conover's attorney asked Conover whether he ever went back to Dr. Jackson.  Conover said no.  Conover said that he could not return to Dr. Jackson for recommended treatment because he could not afford it and did not have insurance to pay for it.  Conover testified that his condition has\d gotten worse.  Conover said that his medicine did not seem to help a lot for the tremors and neck spasms.  Conover testified that his daily activities were largely unchanged.  R. 375-81.

The ALJ then asked Hammond about the jobs identified by Gladden in her testimony at the prior hearing (i.e., cleaner, receptionist, information clerk, cashier, bookkeeping clerk and general office clerk), "Would you consider them to be routine and repetitive or how would you consider them to be?"  R. 384.  Hammond responded, "I would consider those to be routine and repetitive activities, Your Honor, that fall within the hypothetical that you have provided."  Id.

---

[2]The ALJ identified the vocational expert as Bob Hammond in the Decision.  R. 15.  His first name does not appear in the Transcript of the hearing.  R. 372-88.

On June 5, 2006, Dr. Jackson prepared a supplemental report regarding Conover.  R. 323-25.  Dr. Jackson explained that he spent eight hours with Conover to complete the testing and evaluation.  Dr. Jackson also explained the MMPI-2 test.  This was one of several tests that he used to evaluate Conover.  Dr. Jackson stated that the October 16, 2004, report, "stands as my assessment of the residual mental states of the claimant at that time."  R. 323.

The ALJ issued her second Decision June 22, 2006.  She incorporated her first Decision by reference.  At Step 2 of the Analysis, the ALJ identified Conover's severe impairments as spasmodic torticollis, tremors, degenerative cervical spondylosis, anxiety disorder, and depression.  R. 21.  The ALJ determined that Conover's condition did not meet a Listing at Step 3.  R. 21-22.  At Step 4, she modified her analysis of his RFC to take into account the mental evaluation of the June 2003, Mental RFC Assessment.  The ALJ noted that the Mental RFC Assessment, "found mild restriction of daily activities, moderate restrictions in social functioning and the ability to concentrate, along with one or two episodes of decompensation."  R. 27. The ALJ concluded that these opinions were not supported by Dr. Vincent's evaluation, or by the report from Dr. Dimond.  R., at 27-28.  The ALJ,

however, determined, "To give the claimant the benefit of the doubt, he is found to have severe mental impairments which . . . limit him to unskilled, routine and repetitive work." R. 28. The ALJ did not mention the opinions in the Mental RFC Assessment that: (1) Conover was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and (2) he should avoid dealing with the public.

The ALJ then determined that Conover had the RFC to perform unskilled light and sedentary work, with no climbing or work at unprotected heights, no over-shoulder work and no work requiring more than occasional neck turning, subject to the additional limitation that he could only perform simple, repetitive tasks. She concluded that this additional limitation would address the impact of Conover's mental condition on his ability to work. R. 28. The ALJ then concluded at Step 4 that Conover could not perform his prior work.

The ALJ then moved to Step 5. Based on the testimony of the two vocational experts at the two hearings, she found that Conover could perform a significant number of jobs in the national economy. Gladden identified several jobs in the first hearing that met the RFC that the ALJ

defined at that point, and Hammond stated in the second hearing, that those same jobs involved simple, repetitive tasks. The ALJ, thus, concluded that Conover could perform those jobs with his revised RFC. The ALJ concluded that he was not disabled. R. 28-29. Conover appealed that Decision, and the Appeals Council denied Conover's Request for Review. R. 7. Conover then filed this action for judicial review.

## ANALYSIS

This Court reviews the ALJ's Decision to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). The ALJ further must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence. Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

The Court cannot "track" how the ALJ considered all of the important

evidence of Conover's mental condition.  Specifically, the ALJ did not address the opinions in the Mental RFC Assessment that: (1) Conover had moderate limitations in his ability to complete a workday and a workweek due to his mental conditions; and (2) Conover should avoid dealing with the public.  These two opinions appear to be consistent with the medical evidence.  The psychologists all found that Conover suffered from depression.  Dr. Dimond recommended medication.  Dr. Vincent found major depression.  Dr. Jackson's tests indicated moderate depression, and Dr. Jackson listed major depression as a possible diagnostic impression.  Dr. Dimond also stated that Conover came home exhausted and immediately fell asleep.  This information was gleaned during the course of marriage counseling, and so, presumably was not based solely on Conover's statements, but was confirmed by Conover's wife.  Dr. Vincent opined that as a result of his depression, Conover had, "difficulties with, at times, motivating himself to the point where he feels somewhat sluggish and cannot get going, hence he experiences fatigue."  R. 136.  This evidence from Drs. Dimond and Vincent is consistent with the Mental RFC Assessment that his condition would affect Conover's ability to complete a

workday and workweek.[3]  Dr. Vincent and Dr. Jackson also both opined that Conover was self-conscious around others due to his spasms and tremors.  This is consistent with the opinion in the Mental RFC Assessment that Conover should avoid dealing with the public.

The ALJ's Decision does not mention these two parts of the Mental RFC Assessment.  The ALJ rejected other findings in the Mental RFC Assessment because those opinions were not supported by the medical evidence.  R. 27.  These two opinions, however, appear consistent with the medical evidence.  Depending on how the ALJ evaluates these two opinions in light of the rest of the evidence, the possible resulting limitations could materially affect Conover's RFC, and so, his ability to perform a significant number of jobs in the national economy.  For example, Gladden identified cashier, receptionist, and information clerk as three of the jobs Conover could perform.  These jobs would seem to involve dealing with the public, and if so, Conover may not be able to perform them.  Furthermore, Gladden testified that the Department of Labor considered regular absences of twice

---

[3]The record from Sears that Conover worked an average of 55 hours in an 80 hour pay period in his last year of work is also consistent with the Mental RFC Assessment that he is limited in his ability to complete a workweek.  Conover's statement that his condition did not affect his attendance is inconsistent with the Sears' records and his testimony at the first hearing, and so creates some confusion on this issue.  The ALJ may also want to seek additional information to clarify this inconsistency.

a month as grounds for dismissal.  This evidence could affect Conover's RFC, depending on how the ALJ evaluates the opinions regarding Conover's ability to complete a workweek.  The ALJ did not address these issues in her Decisions.  The matter, thus, must be remanded for further consideration.

On remand, the ALJ should also specifically address the opinion in the Physical RFC Assessment regarding Conover's ability to sit.  The Physical RFC Assessment indicated that Conover could not sit for six hours in an eight-hour workday.  This limitation also might affect his RFC, and so his ability to perform a significant number of jobs in the national economy.[4]

Conover also argues that the ALJ erred because she did not give Dr. Harney's opinion controlling weight as Conover's treating physician.  A treating physician's opinion is to be given controlling weight if it is well supported by medical findings and is not inconsistent with other substantial evidence in the record.  Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001); 20 C.F.R. § 404.1527(d)(2).  In this case, Dr. Harney's opinions regarding Conover's physical limitations are supported by little objective

---

[4]The ALJ also stated in her first Decision that Conover drove and used the computer.  The ALJ should explain more thoroughly the extent to which Conover is able to drive and the extent to which he used the computer.  Her statement in the Decision did not fully address all of the evidence on these points and did not explain the significance of her finding on these points.

medical evidence.  Conover clearly has torticollis and tremors.  All of the physicians observed these conditions.  The medical tests, however, did not measure the severity of the condition.  Dr. Mehra treated Conover and concluded that his tremors were 60 to 70 percent controlled with medication.  This evidence is inconsistent with Dr. Harney's opinion.  Dr. Dimond's opinion that he did not observe any symptoms that would indicate that Conover should apply for disability benefits is also inconsistent with Dr. Harney's opinion.  Given the inconsistent medical evidence, and the lack of objective testing, the ALJ could properly choose not to give controlling weight to Dr. Harney's opinions regarding Conover's physical limitations.

Conover also challenges the ALJ's credibility determinations.  The Court does not find a basis to challenge her determination of Conover's credibility.[5]  Conover made inconsistent statements in the record.  He stated

---

[5]The Court agrees that the ALJ did not sufficiently explain the basis for her conclusion that Conover has a problem with alcohol abuse, or the significance of that conclusion.  Dr. Dimond stated that Conover abused alcohol on occasion, but did not opine that he was an alcoholic or was alcohol dependent.  Conover gave inconsistent information about his drinking: he told Dr. Bass he drank 6 drinks a day, but, he testified at the hearing that he drank two or three beers two to three times a week.  This evidence raises questions, but does not provide substantial evidence of a history of alcohol abuse.  The ALJ also indicated that Conover's drinking affected his credibility, but did not fully explain why or how.  The ALJ also found that his drinking was not a basis for a severe impairment at Step 2 of the Analysis.  That finding is consistent with

in writing that his condition did not affect his attendance or his ability to work his assigned hours at his job with Sears, yet at the hearing, he testified that he missed work one to two days a week.  He also stated in writing that he did yard work and laundry, yet at the hearing, he testified that he did not do any yard work or chores around the house.  Cf. R. 96 and R. 347-50.  He told Dr. Bass he had six drinks a day, yet he testified at the hearing that he drank two to three times a week, and generally had two to three beers at one time.  Given such inconsistencies, the ALJ had a basis to doubt Conover's credibility.  The Court will not question the ALJ's findings regarding Conover's credibility.

THEREFORE, Plaintiff Stephen Conover's Motion for Summary Judgment (d/e 10) is ALLOWED.  The Defendant Commissioner's Motion for Summary Affirmance (d/e 12) is DENIED.  The Decision of the Commissioner is reversed, and the case is remanded for further proceedings pursuant to sentence four of 29 U.S.C. § 405(g).

IT IS THEREFORE SO ORDERED.

---

the evidence, but Conover did not assert that he had such an impairment.

ENTER:   January 16, 2008

FOR THE COURT:

_____ s/  Jeanne E. Scott _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE